[Christie, Lowe & Heyworth, et al. v. Patton.]

# Christie, Lowe & Heyworth, *et al. v.* Patton.

### *Action for Breach of Contract.* -

(Decided Nov. 24th, 1906.   42 So. Rep. 614.)

*Contract; Certainty; Action for Breach.*—Under a contract, by the terms of which the contractors stated that they would put on their work any number of teams the other party cared to furnish, from one to thirty, giving them work during the construction of certain locks on the Warrior River, stating what the work would consist of, and that the work would continue for that summer season until the high water overflowed the bottoms, and that the work would be resumed next spring, and stating what they would pay for teams and drivers per day of ten hours and under which contract the party furnishing the teams furnished just so many teams as he wished, took off some during a portion of the time with the consent of the other contractor, such contract shows no such mutuality as to be made the basis for a suit for the breach thereof for unearned profits.

APPEAL from Tuscaloosa Circuit Court.

Heard before HON. S. H. SPROTT.

Action for breach of contract by A. P. Patton against Christie, Lowe & Heyworth and others. Judgment for plaintiff. Defendants appeal.

VANDERGRAAFF & VERNER, for appellant.—Counsel discuss assignments of error but cite no authority.

EDWARD DEGRAFFINRIED, R. B. EVINS, and HENRY JONES, for appellee.—No brief came to the reporter.

TYSON, J.—There is no material difference between the parties in the statement of the terms of the contract. Appellants (defendants below) were under contract with the government of the United States to construct locks 4, 5, and 6 in the Warrior river, in this state. In

the prosecution of this work, they required the services of a large number of men, wagons, and teams. There were some verbal negotiations between the contractors (defendants) and Patton & Loftin, which resulted in an arrangement which was afterwards reduced to writing in a letter from the contractors, addressed to Patton & Loftin, which is as follows: "Confirming our verbal statements and promises to you, we will put on our work any number of teams you care to furnish, from one team to thirty teams, and give them work during the construction of locks 4, 5, and 6, Warrior river. The work will consist of excavation, hauling piling, timber, cement, supplies, and machinery. The work will continue this summer season until high water overflows the bottoms, and be resumed again next spring. We will pay you for use of each team (two animals) and driver for a day of ten hours three dollars, or thirty cents per hour. Teams must be in good condition and have good drivers." The date of this letter was May 31, 1900. On receipt of this letter, Loftin decided not to undertake the contract, and Patton (plaintiff) alone began to furnish teams with the knowledge and consent of the contractors, and continued to do so until the 26th of September, 1900, when a conversation was had between Patton and Lowe, one of the contractors, which is claimed by Patton affected the contract. Up to that time the teams that had been furnished by Patton varied each day, dependent upon the requirements of his farm and the work to be done at the locks. It also appears from his testimony that at times between May and September, and especially in July, the work at the locks was suspended because of a rise in the river.

The conversation above referred to was thus detailed by Patton: "When the time came to haul the hay that I had cut and stacked, I had a conversation with Mr. Lowe, in which I told him that I had a quantity of feed that I wanted to store away, and that I would take off a few weakly teams to haul that in, and that after that I would have nothing further for my teams to do, and I would put the whole 15 on. I made this agreement with Mr. Lowe in the latter part of September, a few days before I was discharged. With Mr. Lowe's permis-

sion I took off some of the teams and hauled the hay."
He further testified that on the 29th day of September,
the work of hauling the hay was completed, and that he
was then ready to put the 15 teams continuously at
work, but that the contractors refused to let him do any
more work, and he stated that they thereupon discharged
him. Just at this point there is some divergence in the
testimony. Patton states, in substance, that the con-
tractors refused to allow him to do any more work, ex-
cept that they informed him that there was about 10
day's work at another lock, which he could do if he
wished, but that he declined this work. He states that
after this he kept his teams in readiness so as to com-
ply with his contract, but that the contractors declined
to furnish any other work. Mr. Lowe, with whom Pat-
ton had the conversation, testified that he informed
Patton that there was no more work to be done at the
lock where he had been engaged, but that he was needed
at lock 5; that Patton then left him, not saying whether
he would go or not. He denies that he ever discharged
Patton. Patton admitted he was paid for all work
actually performed, and this suit is to recover the prof-
its which he claims he would have made if he had con-
tinued to furnish 15 teams during the whole period the
work of construction was being performed at the several
locks.

The question of prime importance presented by the
record is whether, by the terms of the contract, a defin-
ite number of teams were employed by the defendants
for a certain and definite time. It is, of course, neces-
sary to a recovery that these elements of certainty
should enter into the contract. While the law does not
favor the discharge of contracts because of uncertainty,
yet, when they are so vague and indefinite in their
terms that the damages flowing from a breach cannot be
ascertained, the courts will not undertake to give them
effect. In *Pulliam v. Schimpf*, 109 Ala. 179, 19 South.
428, the parties became jointly interested in a shooting
gallery under a contract providing that one should fur-
nish the building and the other should furnish the nec-
essary rifles, etc., and manage and conduct the business,
and that the net profits from the business was to be

[Christie, Lowe & Heyworth, et al. v. Patton.]

divided between them ,and that the business was to be conducted as long as it was profitable and paid expenses. It was held that the contract, because of its indefiniteness and uncertainty, did not furnish a cause of action which would support a judgment for a breach occasioned by its termination by the defendants. In the opinion it is said: "Again, in all human conception, what is the measure of damages for the breach of an agreement like this? The only measure alleged is the loss of anticipated profits. Conceding that the past profits are legal criteria by which to judge the future, for upon what period of time must the future profits be computed?" In *Erwin v. Erwin*, 25 Ala. 236, the contract was that, if the plaintiffs would buy out a certain storehouse and lot and stock of goods from defendant, the latter would assist them by indorsing their paper and advancing them money to enable them to carry on the mercantile business advantageously, or, as alleged in another count, would indorse for them in Charleston, and, if necessary, advance money to them to enable them to carry on the mercantile business. It was held, on demurrer to the complaint, that the contract was too indefinite and uncertain to support an action. In *Howard v. E. Tenn., Va. & Ga. R. R. Co.*, 91 Ala. 268, 8 South. 868, the railroad company employed the plaintiff as its land agent at a stipulated monthly salary, "to travel and work for the road, to induce capitalists to make investments along its line and excursionists to travel over the road." No period of time for its continuance was specified. It was held void for uncertainty. Speaking to this point the court said: "In order to constitute a strictly express contract of hiring, the contract should be definite as to all essential elements, as time, business, and compensation. * * * There is no provision in the contract which would have prevented the plaintiff from leaving the service of the defendant at any time, and, to be a valid contract, it must be mutually binding."

Without further citation of authorities, let us apply the principles announced in these decisions to the present contract, assuming it to be a contract. Turning to the letter of May 31st, which is said to disclose the con-

tract first made between the parties, the contractors stated that they would put on their work any number of teams Patton cared to furnish, from 1 to 30, and give them work during the construction of locks 4, 5, and 6, Warrior river; that the work would consist of excavation, hauling piling, cement, supplies, and machinery, and would continue for that summer season until high water should overflow the bottoms, and would be resumed again the next spring; that they would pay for a team of two animals and a driver, for a day's work of 10 hours, $3, or 30 cents per hour. It is too evident to admit of controversy that if Patton had furnished 30 teams on the 1st day of June, 1900, under the terms of this letter, he would not have been compelled to continue to furnish them during the whole period of construction covered by the agreement between the contractors and the United States government. Indeed, it is shown the parties put no such construction on the contract, for Patton furnished only just so many teams as he wished. But it by no means appears that the employment of plaintiff's teams was to be coextensive either with the contract between the contractors and the government or during the entire progress of the work. While the contractors state in their letter that they would put on the work any number of teams the plaintiff cared to furnish, and give them work "during the construction of locks 4, 5, and 6," the word "during" does not necessarily mean that the employment would extend over the whole period of construction. While one meaning ascribed to the word is "throughout the course of," it also means "in time of"; "in course of."

Taking it in connection with the context and the situation of the parties, it could well have been intended to mean that at any time while the work was in progerss they could find employment for as large a number of teams as the plaintiff cared to put on, but that they did not intend, by the use of the term, to enter into an agreement that the employment should be coextensive with the construction of the locks. The contract affords no evidence that Patton ever knew what the agreement with the government was, whether the work was to be completed in three years or ten, and certainly the

[Christie, Lowe & Heyworth, et al. v. Patton.]

contract does not show. Were the contractors, under their contract with the government, to finish the locks without reference to time, or did they contract to do the work within a certain period? If the time was unlimited, and the plaintiff's contract, as he insists, was coextensive with the period required for completion, it would result, on his construction, that he contracted to furnish a definite number of teams for a definite price for a period which might be three years, or it might be twice that number, dependent upon the seasons, and other contingencies. If, on the other hand, the contractors were limited in respect to time of completion, the plaintiff's teams could only have worked during that period, less the wholly indefinite time when the water was too high to admit of work.

The basis for the estimate of the damages under the first kind of a contract, if it could be said to furnish a basis, would be different from that under the second kind of a contract, which evidently would furnish no basis at all. For if the contract was limited as to the time, and if the work was to cease when the water was too high, it is evident there would exist no basis on which the number of days the plaintiff would work in future could be estimated. There being nothing in the contract between plaintiff and defendants to indicate whether defendant's contract with the government was limited or unlimited as to time, and it being evident that the contractors never intended to contract for a team longer than they had the contract, furnishes, for this reason, no basis upon which damages could be estimated if it were otherwise sufficient. Granting, therefore, that the transaction amounted to a contract, it was wholly indefinite as to its duration, and, therefore, lacked one of the elements necessary to any estimate of damages. But was it a contract? Did the contractors intend to employ a given number of teams at the same unchangeable price during operations that might require years for their completion? And did the plaintiff bind himself irrevocably to furnish the same number of teams for the same indefinite period, covering a number of years? It is inconceivable that contractors on public works, dependent upon contingencies such as the

continuance of annual appropriations by Congress, the ability to secure labor, and the uncertainty in the condition of the river, intended to enter into any such agreement, and it is equally inconceivable that any responsible person could be found who would accept such proposition, if made. In our opinion, such is not the correct interpretation of the transaction. The statement made by the contractors was intended to furnish information along general lines as to the character of work required, of the prices to be paid, and that it was of such magnitude as that it would offer employment for a considerable period. The fact that the employment was to be paid for by the day or by the hour showed that it was not for any given period, as does the character of the employment and every other incident of the arrangement. It was the statement of what might reasonably be expected to occur, and not of what they agreed should occur.

In *Montgomery Southern R. R. v. Mathis*, 77 Ala. 357, 54 Am. Rep. 60, representations made on securing subscriptions to the capital stock of a railway company to persons living along the contemplated route, as to its intended location and the time within which it would be completed to a particular place, were construed to be mere representations not affecting the subscriptions. In *Birmingham Warehouse Co. v. Elyton Land Co.*, 93 Ala. 549, 9 South. 235, that the president of a land company, negotiating a sale of lots to a purchaser, represented to the purchaser that the business of the land company was in close relations with several railroads of the city, that it was building a belt railroad down a certain street, so that it would pass within 500 feet of the lots offered, that they were now working on it, and that the engineers were then on the lots, did not amount to a promise or engagement on the part of the land company, but were matters of opinion that had no relation to the contract. In the case of *Bradfield v. Elyton Land Co.*, 93 Ala. 527, 8 South. 383, the bill alleged that the "Belt Line was located on Tenth avenue and was then building and operated as a permanent road, and that such representation amounted to an engagement, and formed part of the consideration for the

purchase of the lots." To the contrary it was held that they were mere expressions of opinion, which in no wise affected the contract of purchase. The same principle is illustrated in cases that have arisen in connection with contracts with building and loan associations. In *Beyer v .Nat. B. & L. Association,* 131 Ala. 369, 31 South. 113, it was alleged that the agent of the company who obtained the subscription represented that calculations had been made showing that the stock of the association for which the purchaser was asked to subscribe would mature in six years, and that on making monthly payments of dues, interest, and premiums for that period his loan would become liquidated and canceled, and that he relied upon these representations in making the purchase. It was held that the matters stated were mere expressions of opinion in respect to the future, and became no part of the contract.

No contract whatever is disclosed here. It is an offer to pay $3 per day, or 30 cents per hour, for teams in good condition. The remainder of the letter consists of mere statements, as we have seen, by way of general information of the character of the work and its possible duration. It lacks the essential elements of certainty as to the time during which the plaintiff's teams would be employed, and discloses by all its terms that the plaintiff could have withdrawn his teams whenever he saw fit. Nor was there any change effected by the subsequent conversation. The plaintiff in this conversation stated to one of the contractors that he needed some of the teams for hauling hay, that he would take off a few of the weakly teams for that purpose, and that after he had finished he would have nothing further for his teams to do, and would put the whole 15 on the work. He says that Lowe, the partner with whom he talked, assented to this, and he construes this as an assertion on the part of the contractor that they had the right to control the teams. If the plaintiff had offered to withdraw his teams, and the contractor had denied this right, such denial might have afforded some evidence that the contractors believed they had a right to the services. But even this could not have had the effect to form a contract, if one had not already been

[Couch, et al. v. Couch, et al.]

made. The proposition to withdraw the teams came, however, from the plaintiff, and the assent of the contractors might as well be referable to a concession of the plaintiff's right to withdraw as to the assertion of any right on their part to retain the teams. But, be this as it may, neither the conversation, nor the letter, nor both taken together, discloses for the reasons assigned, an agreement between the parties which could be made the basis of an action to recover future profits alleged to have been lost by the refusal of the contractors to give the teams further and future employment.

It is unnecessary, in this view of the case, to consider the various rulings of the court. It being evident that the plaintiff had no cause of action, all the trial court's rulings to the contrary were erroneous. The judgment appealed from will be reversed, and one will be here rendered for defendants.

Reversed and rendered.

WEAKLEY, C. J., and SIMPSON and ANDERSON, JJ., concur.