TRUSTEES FOR OHIO & BIG SANDY COAL CO., UNITED THACKER COAL CO., AND FEDERAL GAS, OIL & COAL CO., PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7888. Promulgated February 8, 1929.

274

*Lyle T. Alverson, Esq., Buford C. Tynes, Esq.,* and *Wayne Johnson, Esq.,* for the petitioners.

*L. L. Hight, Esq.,* and *L. C. Mitchell, Esq.,* for the respondent.

282

OPINION.

LITTLETON : The major issue presented in this case is the fair market price or value on March 1, 1913, of certain undeveloped coal property owned by the United Thacker Coal Co. on that date and sold by it on September 17, 1917. The Commissioner determined that the March 1, 1913, value of the entire property sold (including coal, sur-

face and timber lands) was $4,179,537 and that the difference between this amount and the net amount received for the property, $5,569,200 ($6,903,000 less commissions, attorney's fees, etc., of approximately $1,333,000) constituted taxable income. The assignment of error is that the value determined by the Commissioner as of March 1, 1913, is less than the true value on that date. In an amended answer the Commissioner alleged that the March 1, 1913, value as shown by him in his deficiency notice was excessive and accordingly asked that the Board find a greater deficiency than that previously determined. During the hearing this allegation of error and request for affirmative relief were withdrawn. It further appears that in the original petition the petitioners alleged that the cost of the property sold was less than its value on March 1, 1913, and also less than its selling price, but this allegation was denied by the Commissioner. Later, in his answer to the first amended petition the Commissioner admitted that a portion of the lands in question was acquired prior to March 1, 1913, at a cost less than the value thereof at March 1, 1913, and less than the price for which sold, but denied that all of the lands sold were acquired prior to March 1, 1913. This allegation with respect to the acquisition of some of the properties subsequent to March 1, 1913, was repeated in a second amended answer. However, during the hearing the Commissioner withdrew the allegation that any of the lands sold were acquired subsequent to March 1, 1913, and stated that he would stand on his original determination, which was a taxable profit based upon the difference between the March 1, 1913, value and the selling price. That is, as we understand the situation, the basis of the Commissioner's denial, that cost was less than the March 1, 1913, value, was that some of the properties sold were acquired subsequent to March 1, 1913, and with the withdrawal of this allegation the parties are in agreement that the taxable profit is to be determined upon the difference between the March 1, 1913, value, and the selling price, and that the cost of the properties sold was less than the March 1, 1913, value and also less than the selling price. That cost was less than the selling price is further confirmed by evidence showing that substantially· all of the lands held by United Thacker on March 1, 1913, were acquired by this petitioner long prior to that date and that there was an increase in value during this period. We will therefore proceed in our determination on the theory that the parties are agreed that cost was less than the March 1, 1913, value and also less than the selling price.

In support of the contentions of the parties as to the March 1, 1913, value, a voluminous record of oral testimony, in addition to various exhibits, consisting of maps, statistical data of a technical nature, deeds, etc., has been submitted. Coal operators, engineers, timber experts, and other witnesses were called by both parties and

from these sources we have a variety of opinions difficult of reconcilement. On the one hand, if we accept the most extreme position of petitioner's witnesses we would visualize a remarkable coal property that was underladen in its entirety with three excellent seams of coal which substantially began and ended within the confines of this property; that this property was adapted for mining under ideal conditions there prevailing, both as to character of mining to be employed and also as to roof and floor conditions within the mines; that the transportation conditions afforded an exceptional advantage; and that the surface was covered with an abundant supply of high-grade merchantable timber. On the other hand, we have a picture presented by the Commissioner to the effect that the coal contained in this property did not possess highly superior qualities as compared with coal in nearby properties; that roof conditions in some respects were bad; that there was a fault line in the properties sold; that there was comparable coal property adjoining or adjacent to the tract in question; that the transportation facilities were not of a decided advantage; and that there was no merchantable timber on the property sold. All of the evidence was not of the foregoing types, though that of petitioners tended to present the former picture and that of the Commissioner the latter. The evidence is conflicting and we must look with true perspective, having in mind that neither an unduly optimistic, nor an unduly pessimistic view should be the guide in arriving at what would have moved a willing seller or willing buyer to have become a party to a sale at March 1, 1913.

The first difficulty in fixing a fair market price or value at March 1, 1913, is that we do not have what we regard as comparable sales of similar property as a guide for our determination. It is true that we do have evidence of sales of nearby or adjoining coal properties, but either the necessary elements of similarity were not shown to be present or fatal elements of dissimilarity were shown to exist. In one instance, a group of five sales of small tracts was offered as one of the factors used by one of the Commissioner's witnesses to determine the value in question. Not only was it affirmatively shown that these properties were inferior, either on account of the quantity and quality of the coal or account of location or for some other reason, to the United Thacker properties, but also it was shown that the sales took place three or four years prior to March 1, 1913. The evidence as to the sale of a large tract and the valuation of still another larger tract was far from satisfactory as to comparability and afforded no conclusive guide from which we could make our determination. The witness who testified as to these sales presented certain evidence as to assessed valuations, but its reliability was not shown

to be greater than that of similar evidence which we have often been forced to disregard as having no reasonable relation to the value sought to be ascertained. By taking the aforementioned sales and assessed valuations into consideration, the witness who testified in regard thereto fixed a value on the property sold of approximately $50 per acre. This is the lowest value which we were asked to accept and represents what, in our opinion, might be termed the unduly pessimistic view of the situation. That even the Commissioner does not consider it of great weight is shown by the fact that while his determination on which the deficiency is based is more than twice that fixed by this witness, and while a request for affirmative relief had been made on the ground that the value was less than that previously determined, such request was withdrawn.

Next we are unable to accept the extreme view presented by one of petitioner's witnesses that the value of the coal lands (exclusive of the value for surface, other than that required for plant, and timber lands), was $165 per acre. When to this are added the minimum values contended for by the petitioners for surface and timber, we have a value at March 1, 1913, substantially in excess of that for which the tract was sold in 1917, even if we leave out of account the very substantial commissions paid on account of the sale. In the light of the testimony of witnesses on both sides as to the condition in the coal industry in 1913 as compared with 1917, we do not consider this valuation reasonable, nor consistent with other facts herein presented. It is predicated upon the theory that at March 1, 1913, it would have been reasonable to have considered that the entire tract of 39,300 acres could have been leased to responsible operators on the basis of 12 cents per ton and $10 per acre minimum royalty; and that over a period of 40 years the minimum royalty would have been exceeded by at least 50 per cent, thus making a return of $15 per acre over the 40-year period, or $589,500 per year. This would have meant an average annual production over the 40-year period beginning on March 1, 1913, of 5,000,000 tons. While the evidence shows that leases could have been made on the basis outlined in our findings and also that in many instances it would have been reasonable to expect that the minimum royalty would have been exceeded by 50 per cent, we are not satisfied that a purchaser on March 1, 1913, would have purchased the mineral rights in the property in question on March 1, 1913, on the basis of an expected royalty of 12 cents per ton on 5,000,000 tons for 40 years. In fact, the witness who testified as to this basis of valuation disclaimed any intent to testify as to market value other than that he thought the market value would be close to the intrinsic or potential value which he arrived at on the basis of his formula. He stated further that he knew of no case where the basis

used by him had been applied to determine the price at which coal property was sold. The potential earning power of this property is evidence entitled to be considered and weighed in an ultimate determination as to the fair market value of the property, but, in view of the many factors (some of which are unknown) which enter into such a determination, we are unwilling to accept this as the final criteria of value in this case. In arriving at this conclusion, we are not overlooking the "reasonable royalty" rule to which our attention has been called by the petitioners and for which the petitioners cite as authority *Dowagiac Manufacturing Co.* v. *Minnesota Plow Co.*, 235 U. S. 641. An examination of that case, however, shows that the situation there presented merely involved the question of how much damage had been suffered on account of certain infringing sales which had been made of articles covered by a patent and where, on account of the monopolistic character of the patent, there was no established royalty. The court held that in determining the damages, it was permissible to show what would have been a reasonable royalty. That situation was vastly different from this case, where we have a large tract of undeveloped coal land about which we must accept a myriad of estimates as to the factors necessary to make our calculation. For example, we must be able to say that there was a given quantity of coal, that the entire tract could have been leased on March 1, 1913, on the basis herein set forth, that the market would have been able to absorb a quantity of coal sufficient to produce the royalties on which the valuation is based, that the quality of coal and mining conditions as revealed by operations would be at least equal to that which was known on March 1, 1913, and that other factors, unnecessary to mention, would likewise be favorable to such a development. Some of the foregoing factors we regard as having been reasonably known on March 1, 1913, but we are not prepared to say that all of them were so established that on the basis of a mathematical computation it would have been reasonable to compute, in the manner done by the petitioner, what a reasonably prudent man would pay for the property. In view of the many uncertainties attending the development of an operation of this character, would not the more reasonable view be that the prudent man would discount many of these factors before investing on the basis thereof? We think so. From the foregoing observations we do not mean that the valuation reached on the basis of expected royalty is entitled to no weight in disposing of the issue presented; what we do say is that we are not willing to accept it as the true measure of the fair market price or value of the property in question at March 1, 1913. See *United Fuel Gas Co.* v. *Railroad Commission of Kentucky*, 278 U. S. 300.

Between the two foregoing valuations, the former of which might be denominated the "low" of the Commissioner and the latter the

" high " of the petitioners, we have other valuations which we regard as likewise inconclusive. We deem it sufficient to say, as to a valuation of $80 per acre fixed by one of the Commissioner's witnesses, that the lands sold which formed the basis of this opinion were shown not to be comparable to those here in question and that conditions surrounding the sale took from it some of its character as an open and arm's-length sale. As to the value of $140 to $160 fixed by one of petitioner's witnesses, this was arrived at in a manner somewhat similar to that of the other witness of petitioners, who fixed a value of $165 per acre, and similar objections may be made against it.

A not inconsiderable part of the evidence presented had to do with the merchantable timber on the property sold. If anything, the conflict here was greater than that with respect to the other testimony to which we have referred, varying from the opinion of one of the Commissioner's witnesses that there was no merchantable timber on the land to that of petitioner's witnesses who assigned a value in excess of $600,000. In our final conclusion we did not attempt to set a value for the timber separate and apart from the value of the mineral and surface lands, but have considered it sufficient to fix a value for the entire boundary, which would include timber and which gives due weight to the evidence presented on account thereof.

Finally, we have the fact that the entire boundary of the 61,000 acres was offered for sale in or about 1913 for $110 per acre and the further fact that the same property was again offered for sale in 1916 at $150 per acre. This latter offer finally resulted in the sale in 1917 of 39,300 acres at $175 per acre. The evidence is conclusive that the part sold was more valuable than that retained, some testimony being to the effect that the part sold had approximately twice the value per acre of that retained. It is, of course, well recognized that an offer to sell, not followed by a completed sale, lacks the probative value of a sale itself in fixing values, though the offers in this instance would at least indicate that the United Thacker considered the properties of decidedly more value in 1916 than in 1913, which is at variance with the testimony of its witness that the value in 1913 was greater than in 1917. The further conclusion seems to us reasonable that when the offer was made to sell the property in 1913, the price at which it was offered was an " outside " or maximum market value for the property. The owners of the property were offering it for sale when they were not unacquainted with its virtues—in fact, were doubtless better acquainted with its value than anyone else at this time, and when they were not forced to dispose of the property. In other words, we have the seller willing but not forced to sell, and aware of the merits of the property offered for sale. Further, the offer was furnished to a representative who was expected to use it as a basis for starting negotiations with coal men in England, and could

hardly be expected to represent the minimum figure at which the owners would be willing to dispose of the property. While this offer was made of the entire property, from the evidence presented as to the relative values of the part sold and that retained, it is possible to arrive at what might likewise be considered as the maximum value for the tract here involved.

We likewise have the Commissioner's determination that the property had a value on March 1, 1913, of approximately $107 per acre and that he elected to stand on this valuation after having abandoned his former position that the value of the property was less than this amount, though, of course, his determination is entitled only to a consideration of *prima facie* correctness.

The foregoing comments are by no means an exhaustive discussion of the strength and weaknesses of the mass of evidence presented, but are considered sufficient to show the difficulties with which we have been confronted. We have, however, considered and weighed all of the evidence presented, and have reached the conclusion that the March 1, 1913, market price or value of the 39,300 acres of land sold including coal, timber, and surface land, had a total value of $4,833,900, or an average per acre of $123. In arriving at this determination of value we have not attempted to assign any definite weight to a particular part of evidence, nor have we disregarded any evidence which seemed pertinent.

While we have discussed the evidence as to events subsequent to March 1, 1913, we have confined our judgment to the value to the conditions existing on March 1, 1913. · In *James Couzens*, 11 B. T. A. 1040, at page 1165, we stated:

* * * Value on March 1, 1913, is not to be judged by subsequent events. There is, however, substantial importance in the reasonable expectations entertained on that date. Subsequent events may serve to establish both that the expectations were entertained and also that such expectations were reasonable and intelligent. Our consideration of them has been confined to this purpose. Such subsequent events as have no reasonable relation to the considerations of the date in question have been disregarded. We have not, by looking at the subsequent events now known, found what the value would have been had they ·been definitely known on March 1, 1913. The only facts upon which our judgment of value has been predicated are those reasonably known on that date.· These included not only those which had completely occurred, but also those which were in process and those which were reasonably in contemplation.

The next issue is whether the Ohio & Big Sandy and the United Thacker were affiliated for the period April 30, 1917, to December 20, 1917. Section 1331, Revenue Act of 1921, defines affiliation under the Revenue Act of 1917, in so far as pertinent to the issue here under consideration, as follows:

(a) That Title II of the Revenue Act of 1917 shall be construed to impose the taxes therein mentioned upon the basis of consolidated returns of net income and invested capital in the case of domestic corporations and domestic partnerships that were affiliated during the calendar year 1917.

(b) For the purpose of this section a corporation or partnership was affiliated with one or more corporations or partnerships (1) when such corporation or partnership owned directly or controlled through closely affiliated interests or by a nominee or nominees all or substantially all the stock of the other or others, or (2) when substantially all the stock of two or more corporations or the business of two or more partnerships was owned by the same interests: *Provided,* That such corporations or partnerships were engaged in the same or a closely related business, or one corporation or partnership bought from or sold to another corporation or partnership products or services at prices above or below the current market, thus effecting an artificial distribution of profits, or one corporation or partnership in any way so arranged its financial relationships with another corporation or partnership as to assign to it a disproportionate share of net income or invested capital. * * *

The first objection made by the petitioners to their affiliation under the foregoing provision is that the period for which the Commissioner has held them affiliated is only a fractional part of a year and not the entire calendar year 1917; that is, as we understand the petitioners, they contend that the only affiliated status cognizable for 1917 is a calendar year of 12 months, beginning January 1, 1917, and ending December 31, 1917. We are unable to agree with this position. Prior to the enactment of the Revenue Act of 1921, there existed no statutory authority for consolidated returns in 1917; whatever authority existed was contained in regulations promulgated by the Commissioner. (Articles 77 and 78, Regulations 41.) These regulations provided for consolidated returns for the purposes of the excess-profits tax. There was no excess-profits tax prior to 1917 and consequently these regulations did not apply prior to such year. The Revenue Act of 1918 (section 240) specifically provided the terms and conditions under which consolidated returns were to be filed for 1918. The situation, therefore, which Congress had before it was that under the Commissioner's regulations corporations were permitted or required to file consolidated returns for 1917, when no specific statutory authority appeared to exist for such action. In order to remove any doubt as to the legality of this procedure and validate the existing regulations for 1917, section 1331 was enacted. (H. Rept. No. 350, 67th Cong., p. 16, and S. Rept. No. 275, 67th Cong., p. 34.) That is, what we understand Congress was seeking to accomplish was the enactment of legislation which would make valid the acceptance of consolidated returns for the whole of 1917—not 1916 nor 1918.

Admittedly, as the petitioners point out, section 1331 is applicable to corporations that "were affiliated during the calendar year 1917," and it is also true that the word "during" is often used in the sense

of "throughout," but we can not agree that the word "during" as here used requires that the affiliation should continue throughout the whole of the calendar year 1917 in order to make the provisions applicable. In fact, at least two of the cases cited by petitioners tend to support our view of the issue here under consideration, and the others deal with situations where the interpretation given is consistent with the state of facts presented. The court in *Christie, Lowe & Heyworth* v. *Patton*, 148 Ala. 324; 42 So. 615, stated, in reference to the meaning of the word "during," as follows:

\* \* \* While the contractors state in their letter that they would put on the work any number of teams the plaintiff cared to furnish, and give them work "during the construction of locks 4, 5 and 6," the word "during" does not necessarily mean that the employment would extend over the whole period of construction. While one meaning ascribed to the word is "throughout the course of," it also means "in time of;" "in course of."

Another case, *American Linseed Co.* v. *Eberson*, 126 Mo. App. 426; 104 S. W. 121, gives the following definitions:

\* \* \* It is true the word "during" has one meaning which is not inconsistent with the idea of continuous delivery throughout a given period, but it has another meaning compatible with total delivery on any date within the period. It is defined as follows: "In or within the time of; at some period in; or throughout the course, action, existence, or continuance of; as 'it happened during the war'; 'it continued during the night.'" (Standard Dictionary.)

In this case the conditions outlined in section 1331, requisite to affiliation, as to the ownership of stock in one corporation by another corporation were satisfied from April 30, 1917, to December 20, 1917, and we are of the opinion that this satisfies these requirements for an affiliation *during* or *at some.period in* the calendar year 1917.

The further objection raised to the affiliated status is that the Ohio & Big Sandy and the United Thacker were not "engaged in the same or a closely related business." The business of the United Thacker was the ownership of coal and timber lands which it was engaged in prospecting and rounding out. No direct evidence was given as to the business of the Ohio & Big Sandy other than that it held the stock of the United Thacker, but whether this was its sole business, we do not know. Likewise, we know nothing as to what arrangements or agreements may have existed between the two companies which would have caused them to be affiliated regardless of the character of their businesses. The Commissioner has determined that they were affiliated for the period in question and, on the record, we do not find sufficient evidence to disturb his action.

A further contention is advanced that the deficiencies are void because they comprehend a period for which no tax is imposed. The Ohio & Big Sandy Coal Co. kept its books and made its returns on the basis of a fiscal year ended April 30, and the United Thacker

Coal Co. kept its books and made its returns on the basis of a fiscal year ended June 30. The Commissioner held that the two corporations were affiliated from April 30, 1917, to December 20, 1917, the latter date being the date when the Ohio & Big Sandy, which held all of the stock of the United Thacker, distributed all of its stock to its stockholders, thus ending the affiliation between the companies. The Ohio & Big Sandy was dissolved on or about December 29, 1917, but the United Thacker continued in existence after the close of its fiscal year ended June 30, 1918. Since the period of affiliation ended on December 20, 1917, the Commissioner computed an excess-profits tax on the consolidated net income of the two companies for the period of 7 months and 20 days and also computed an income tax for each of the companies on their respective separate incomes for the same period.

In so far as this contention of the petitioners relates to excess-profits tax, we are of the opinion that it is not well taken. For 1917, consolidated returns were permitted or required only for excess-profits-tax purposes, but wherever it was necessary to file a consolidated return in 1917, we do not understand that a different rule should be applied as to the period to be covered by such return than under the Revenue Act of 1918, as to which we have held that where corporations were affiliated for only a part of a year a consolidated return should be filed for the period of affiliation and separate returns for the corporations for the part of the year when they occupied a nonaffiliated status. *American La Dentelle, Inc.*, 1 B. T. A. 575; *Sweets Company of America, Inc.*, 12 B. T. A. 1285. In this case, the Ohio & Big Sandy and the United Thacker were held to be affiliated for excess-profits-tax purposes for the period April 30, 1917, to December 20, 1917, and, accordingly, a consolidated return for such purpose and for such period was required. That it comprehended a period less than 12 months, or that it did not coincide with the fiscal year of the United Thacker is immaterial; a separate tax status for excess-profits-tax purposes existed for this period. The action of the Commissioner in computing an excess-profits tax on the basis of a period of 7 months and 20 days is accordingly sustained.

The Commissioner, however, determined not only the excess-profits tax on the basis of 7 months and 20 days, but also the income tax for both the Ohio & Big Sandy and the United Thacker for the same period. No great objection is made to this action in so far as Ohio & Big Sandy is concerned, since the end of the affiliation period was likewise the approximate end of its corporate existence, but objection is made in so far as United Thacker is concerned, and as to this we are of the opinion that the Commissioner was in error. It is true, as pointed out by the Commissioner, that the income tax for the United Thacker was computed on its separate income for the period

of 7 months and 20 days, and not on the consolidated net income, but wherein lies authority for the computation of income tax to this company on the basis of such a period? We think no authority to do so exists. The affiliation in 1917 is recognized for excess-profits tax only, and whatever separate tax status arose on account of the affiliation was for this purpose and no other. The income tax must be computed as if this affiliation never existed. In the case of the United Thacker, its taxable period, for income-tax purposes, did not begin on April 30, 1917, nor did it end on December 20, 1917; its income tax would be computed on the basis of a fiscal year ended June 30.

In view of the foregoing, we are of the opinion that to the extent that the deficiency in the case of the United Thacker arises from the determination of an income tax for the period April 30, 1917, to December 20, 1917, such deficiency is in error. That is, the correct deficiency for this period, in so far as it pertains to United Thacker, is the difference between the excess-profits-tax liability as determined hereunder and the excess-profits tax as paid, if any, for the same period on account of returns previously filed.

With reference to the contention of the petitioners that the deficiency as determined for the United Thacker is void because the deficiency notice erroneously referred to a letter dated August 17, 1924, when a letter of such date was not issued and also referred to a deficiency for periods other than that from April 30, 1917, to December 20, 1917, we are of the opinion that such position is without merit. We have set forth in our findings a detailed statement of the various letters issued, and from that it is apparent that the period at all times contemplated was the period beginning April 30, 1917, and ending December 20, 1917, and that the erroneous reference to a letter dated August 17, 1924, was not such as in any way misled the petitioners. *Wilkens & Lange*, 9 B. T. A. 1127.

In the next place the petitioners challenge the Commissioner's determination of the total deduction (credit) for excess-profit tax in these respects: (a) The reduction of the consolidated invested capital on which the excess-profits credit was computed by $1,660,-746.61, such action being taken to provide what the Commissioner considered a proper basis where a period of 7 months and 20 days was being used instead of a full year; (b) a similar reduction in the specific credit of $3,000 and the failure to allow a specific credit of $3,000 for each member of the affiliated group, or a total of $9,000; and (c) the reduction of the consolidated invested capital as otherwise computed by subtracting therefrom the amount of $1,019,342.24, being the excess of the book value of the properties of the United Thacker over the value allowable for invested capital.

With respect to the first objection raised above and also the first part of the second objection which relates to the proration of the specific exemption, the Commissioner in his brief filed subsequent to the hearing, admitted that his action in both instances was in error and that no reduction should be made either in invested capital or the specific exemption on account of this determination in 1917 for a period less than 12 months. As to the contention made that a specific credit of $3,000 for excess-profits-tax purposes should be allowed on account of each corporation included in the consolidated return instead of one credit of $3,000 for the entire group, we are of the opinion that this position can not be sustained. While no specific provision is contained in the statute as to the exemption allowable in 1917 to a consolidated group, we think that the same rule which applies under the Revenue Act of 1918 should apply under the Revenue Act of 1917. It is, of course, true that the 1918 Act (section 240 (a)) specifically provided that only one specific exemption of $3,000 should be allowed to the consolidated group, whereas we had no such provision under the 1917 Act, but for that. matter no specific provision was made for consolidated returns under the 1917 Act. The matter was covered only by regulations (articles 77 and 78, Regulations 41) and these regulations were likewise silent as to the exemption allowable. It was not until the Revenue Act of 1921 that we had statutory authority for consolidated returns in 1917 and the statute then enacted (section 1331) merely sought to validate existing regulations and again made no statement as to the exemption allowable. The regulations did provide, however, that the " tax will be computed * * * as a unit upon the basis of the consolidated returns," and section 1331 stated that the tax shall be imposed upon the " basis of consolidated returns of net income and invested capital." Our conception of the effect of a consolidation was set out in *Farmers Deposit National Bank*, 5 B. T. A. 520, as follows:

The effect of the consolidation of two or more companies is to weld them together for the purpose of computing the tax, as though they existed, in fact, as a single business enterprise. Their separate and distinct identities are merged in the interest of their community, just as effectively, so far as concerns the determination of the income and profits taxes, as though they existed under a single charter.

While the foregoing statement was made with respect to a case which arose under the Revenue Act of 1918, the general principles would likewise be applicable to the determination of excess-profits-tax liability under a consolidated return for 1917. In view of the foregoing, we are of the opinion that in computing an excess-profits tax for 1917 on the basis of a consolidated return only one specific exemption of $3,000 should be allowed.

The third objection raised by the petitioners in this connection relates to a reduction of invested capital on account of the excess of book values of the United Thacker's properties over the amount allowable for invested capital purposes. From the deficiency notice it appears that the book value of these properties at April 30, 1917, was $5,770,315.20, whereas the amount allowable for invested capital purposes was $4,750,972.96, or a difference of $1,019,342.24. When the value of $5,770,315.20 is used, the total of assets is equal to the total of the liabilities plus the capital stock, that is, no surplus is shown to exist for this company on April 30, 1917. In the balance sheet as prepared by the Commissioner, which was used as a basis for computing invested capital, the reduced value of $4,750,972.96 was used, and there was shown a deficit as of the same date of $1,019,342.24. The Commissioner alleged that this correction was made in order to reduce the book value of the properties to the value allowable for invested capital purposes. This allegation was admitted by the petitioners; that is, as we understand the situation, there is no contention made by the petitioners that the reduction as made is not correct in order to reflect the true value of these properties for invested capital purposes. No evidence was introduced as to the primary cause of this deficit; we know only that a deficit existed after making the proper correction in the property values, but whether a surplus was created by this appreciation in value which surplus was later distributed or otherwise dissipated, or whether the excess of liabilities and capital stock over the corrected book value may be attributed to operating losses, or whether some other cause resulted in this condition, we are not informed. The first of the above-mentioned situations would produce what is sometimes called a capital deficit, on account of which it would be proper to reduce invested capital, whereas the second situation results in an operating deficit as to which invested capital is not reduced. See *Willcuts* v. *Milton Dairy Co.*, 275 U. S. 215. No contention is advanced by the petitioners that the deficit shown to exist on the adjusted balance sheet resulted from losses, but the treatment accorded this item by the Commissioner was, in effect, to consider that the deficit is of a capital nature. While the Commissioner did not determine the invested capital of each of the companies separately, the effect of his action was to consider that the United Thacker was entitled to an invested capital of $2,981,475.76 (capital stock, $4,000,800 less a deficit of $1,019,374.24). On the basis of the evidence presented, we see no reason for disturbing his action.

With the invested capital of the United Thacker determined at $2,981,475.76 and with the parties in agreement that the invested capital of the Ohio & Big Sandy and of the Federal Gas, Oil & Coal

Co. were $5,589,794.76 and $950,000, respectively, each company being considered separately and without reference to its affiliated status, the question then to be determined is the invested capital for the consolidated group. This would not be the sum of the separate invested capital of the three companies, but this sum less duplications on account of intercompany holdings. See *Gould Coupler Co.*, 5 B. T. A. 499, and *Farmers Deposit National Bank, supra*. An examination of the consolidated balance sheet shows that the Ohio & Big Sandy held the entire capital stock of the United Thacker, $4,000,800, and $940,500 of the capital stock of the Federal Gas, Oil & Coal Co. When elimination is made of these items and certain minor adjustments are made, over which there is no dispute, we arrive at the invested capital determined by the Commissioner and which may be shown as follows:

Invested capital:

| | | |
|---|---:|---:|
| Ohio & Big Sandy | $5, 589, 794. 76 | |
| United Thacker | 2, 981, 457. 76 | |
| Federal Gas, Oil & Coal Co | 950, 000. 00 | |
| | | $9, 521, 252. 52 |
| **Less:** | | |
| Stock of United Thacker held by Ohio & Big Sandy | 4, 000, 800. 00 | |
| Stock of Federal Gas, Oil & Coal Co. held by Ohio & Big Sandy | 940, 500. 00 | |
| Minor adjustments | 920. 03 | |
| | | 4, 912, 220. 03 |
| Consolidated invested capital | | 4, 579, 032. 49 |

The petitioners agree that the reduction as made above on account of the stock of the Federal Gas, Oil & Coal Co. is correct, but contend that if the separate invested capital of the United Thacker is to be reduced by $1,019,342.24 and is to be determined as $2,981,457.76 ($4,000,800 less $1,019,342.24), then it must follow that the correct elimination for purposes of the consolidated invested capital would be $2,981,457.76 instead of $4,000,800. This contention, however, overlooks the fact that the elimination to be made is the investment of Ohio & Big Sandy in the United Thacker, and not the invested capital of the United Thacker. The investment of Ohio & Big Sandy in United Thacker was $4,000,800 and not $2,981,457.76. It is this actual investment of Ohio & Big Sandy in United Thacker which must be eliminated from the consolidated invested capital in order to prevent any duplications through intercompany holdings. To eliminate only so much of Ohio & Big Sandy's investment in United Thacker as is equal to the invested capital of the latter would

fall short of a complete elimination and the result would be a duplication of consolidated invested capital to the extent of $1,019,342.24.

In view of the foregoing considerations, we are of the opinion that the action of the Commissioner in reducing invested capital on account of the excess of book values over the amount allowable for invested capital should be sustained.

A constitutional question was raised by the petitioners to the effect that the valuation of the Commissioner in this case, with the resulting determination of deficiencies on the basis thereof, amounted to a violation of the uniformity clause of the Constitution with respect to the levying of taxes, as well as the provision prohibiting the taking of property without due process of law. In support of an assignment of error to this effect, the petitioners sought to have the Commissioner produce papers and documents which would show the other valuations made by him, which they now contend are inconsistent with the valuation which we are now considering. The objection of the Commissioner to the introduction of this evidence was sustained on the ground that what is here sought to be determined is the true value of certain properties and that the mere fact that other properties were given a different value by the Commissioner would not necessarily prove the incorrectness or inconsistency of either valuation. What may be the value of given properties on a given date is a question of fact which must be determined in the light of all evidence pertaining thereto. To make such evidence as the petitioners would have had introduced serve the purpose which they apparently had in mind, would in effect require a revaluation of all properties with which it is now sought to make a comparison. In other words, we are not dealing with properties which are shown to be comparable, rather with properties which are admitted on all sides to differ in many respects. That a mistake may have been made in this case would not prove that a mistake was made in other cases, nor would a mere showing that other valuations were made of other properties which showed a different value for the properties valued, without a detail showing as to the true value or the comparable nature of the properties sought to be compared, afford any basis for considering the constitutional questions raised. In view of the foregoing, we are of the opinion that the evidence offered with respect to this issue was properly excluded, and accordingly further consideration is unnecessary.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

GREEN did not participate.