ESTATE OF ASLAN BALLAS, Deceased, ELIA BALLAS, Executor, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Ballas v. Commissioner
Docket No. 5851-73.
United States Tax Court
T.C. Memo 1975-103; 1975 Tax Ct. Memo LEXIS 270; 34 T.C.M. (CCH) 506; T.C.M. (RIA) 750103; April 15, 1975, Filed. Donald R. Curry, for the petitioner. Charles L. McReynolds, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined a deficiency of $1,950.00 in the petitioner's Federal estate tax. The only issue to be decided is the fair market value of certain real property includable in the estate under section 2031 of the Internal Revenue Code of 1954. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioner is the Estate of Aslan Ballas, who died March 6, 1970. Elia Ballas, the executor of the estate, resided in Cleburne, Texas, when the petition herein was filed. The petitioner's Federal estate tax return was filed February 4, 1971, with the district director of internal *271 revenue, Dallas, Texas. The petitioner did not elect to have the estate valued on the alternate valuation date. Among other properties, Aslan Ballas owned a lot and building (known as the Watson property) located on one corner of the Courthouse Square in Cleburne, Texas. The building was a two-story brick structure in poor condition. The downstairs was rented to a retail paint and paper store, but the upstairs portion was vacant. It was in need of general maintenance and was in violation of the local building code. The windows were broken out, the doors were sagging, and the floors needed repair. It would have cost about $20,000 to make the building fully suitable for rental purposes. Buildings on nearby lots had collapsed and had been torn down. Many of the buildings around the square were in poor condition and were generally being used by retail businesses, including dry goods and jewelry stores. In 1969, buildings in downtown Cleburne which were similar to the Watson property were selling from $12,000 to $15,000. A lot and two-story building in average to poor condition, located on the south side of the square, was sold for $14,000 around January 1970. The estate hired Isom *272 Finley to appraise the Watson property for Federal estate tax and State probate purposes. He had been continuously engaged since 1946 in the real estate and insurance business in Cleburne, but devoted most of his time to the real estate work. He was licensed by the State of Texas to engage in the real estate business. He belonged to the local real estate board, but was not a member of any professional appraisers association. His real estate sales were not specialized--they included transactions involving rural, urban, commercial, and residential property. He made appraisals for the Santa Fe Credit Union and had performed an average of six to ten appraisals of real property a year since 1946. Mr. Finley was personally familiar with the Watson property and executed an appraisal of it on April 27, 1970. In making the appraisal, he considered the general area, the physical condition of the building, and sales of similar properties, but did not account for the property's rental value. Mr. Finley concluded that the lot was worth $12,500 and the building was worth $3,500, for a total value of $16,000, based on his determination that he could sell it for that price. Cleburne Savings and *273 Loan Association (CSL) owned land immediately behind the Watson property, and owned the vacant lots adjoining the Watson property. By acquiring the Watson property, CSL could obtain the entire corner of the square. Around the end of March 1970, Robert Pedigo, representing CSL, offered Elia Ballas $20,000 for the Watson property. That offer was declined, but on May 16, 1970, Elia Ballas executed a contract to sell the Watson property to Mr. Pedigo for $22,500. The sale was completed on October 7, 1970. Following the purchase, CSL tore the building down. Mr. Finley made his appraisal without knowing of the offer by Mr. Pedigo in March. Even if he had been apprised of the offer, his valuation of the property would have remained the same, since he considered CSL's situation unusual. The estate valued the Watson property at $16,000 as of March 6, 1970, in its Federal estate tax return. In his notice of deficiency, the Commissioner determined that the property was worth $22,500 at that time. OPINION Section 2031 provides that the gross estate shall include the value of the decedent's property at the time of death. Such value is the fair market value of the property, which is defined *274 in section 20.2031-1(b) of the Estate Tax Regulations as: the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. * * * Estate of Maurice Gustave Heckscher, 63 T.C. (Jan. 29, 1975). The controversy presented here concerns the probative force of the price paid by CSL for the Watson property. The Commissioner contended that such price reflects the fair market value of the property since it was reached by a willing buyer and a willing seller. The petitioner argued that such price is not evidence of the property's fair market value since the sale was unforeseeable at the time of death and took place in an abnormal market. Ordinarily, the price set by a freely negotiated agreement made reasonably close to the valuation date is persuasive evidence of fair market value. Ambassador Apartments, Inc.,50 T.C. 236 (1968), affirmed per curiam 406 F. 2d 288 (C.A. 2, 1969); Estate of Lillian May Schroeder,13 T.C. 259 (1949). Appraisals based on market conditions may be rejected in favor *275 of such agreements. White Farm Equipment Co.,61 T.C. 189 (1973); McGowin-Foshee Lumber Co.,10 B.T.A. 961 (1928). The circumstances of the sale provide strong support for finding that, as of March 6, 1970, the fair market value of the Watson property was the price paid by CSL. Within a month after the death of the decedent, the estate declined to accept an offer of $20,000 for the property. Within 3 months after the decedent's death, Mr. Ballas and Mr. Pedigo agreed upon a price of $22,500 for the property. Detroit Trust Co. et al., Executors,25 B.T.A. 340 (1932). There was no indication that either party had any misapprehensions about the relevant facts. Compare Schnorbach v. Kavanagh,102 F. Supp. 828 (W.D. Mich. 1951). The price set by the contract for sale was reached through negotiation. Neither party was compelled to agree to the sale; CSL initiated the proceedings through the preliminary offer to Mr. Ballas, and Mr. Ballas entered the contract for sale when a satisfactory price was set. White Farm Equipment Co.,supra.The parties were apparently serious in making the agreement, *276 for they ultimately consummated the sale at the agreed price. The petitioner's valuation of the property was based on Mr. Finley's appraisal, which, in part, relied on sales of similar properties. The fair market value of the property under consideration may be shown by the sales prices of other properties, but only if such properties are comparable. Ethel P. Hunt et al., Executrices, 12 B.T.A. 396 (1928).Mr. Finley's appraisal relied on sales of other dilapidated buildings in downtown Cleburne, but the Watson property had a unique feature: it provided access from CSL's vacant lots to a corner on the courthouse square. It was not shown that any of the other properties had a similar feature, and consequently, the prices of the other properties are not strongly probative of the fair market value of the Watson property. Trustees for Ohio & Big Sandy Coal Co. et al.,15 B.T.A. 273 (1929), revd. on another issue 43 F. 2d 782 (C.A. 4, 1930). In addition, Mr. Finley did not state his reasons for assigning a $16,000 value to the Watson property, beyond mentioning prices at which other properties had been sold. He merely conjectured that he *277 could sell the property for that amount. Such infirmities render Mr. Finley's appraisal less indicative of the fair market value of the property than the negotiated price set by the sales contract. See Dorothy V. Crane,49 T.C. 85 (1967). The petitioner argued that, at the time of death, it was unforeseeable that CSL would purchase the property at the price it paid, and therefore, the sales price has no bearing on the value of the property at such time. Estate of Mabel Lloyd Ridgely v. United States,180 Ct. Cl. 1220 (1967). Prior to March 7, 1970, CSL owned lots whose access to a corner of the courthouse square was blocked by the Watson property, and such situation remained unchanged until CSL purchased the Watson property. As of March 6, 1970, it was foreseeable that CSL would try to purchase the Watson property; such purchase did not result from any unexpected material changes occurring after March 6, 1970. The petitioner also maintained that abnormal market conditions prevailed, resulting in an inflated price. Estate of Fredericka Loewenstein,17 T.C. 60 (1951). The petitioner's argument is based on CSL's need for the *278 Watson property for access to the corner of the square. However, such fact indicates only that the property was not similar to the other properties on the square and had a particular feature which made it valuable to CSL. A price reached by arm's length negotiations between knowledgeable parties should not be disregarded simply because the purchaser has a special interest in acquiring the property. Cf. Angela Fiorito,33 T.C. 440 (1959); see also United States v. Cartwright,411 U.S. 546 (1973). Decision will be entered for the respondent.